**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ARGONAUT INSURANCE COMPANY and**
**GREAT AMERICAN INSURANCE COMPANY,**
**as subrogees of the TOWN OF DANNEMORA,**

                                    **Plaintiff,**

        **vs.**                                        **8:10-CV-1516**
                                                       **(MAD/CFH)**

**SAMSUNG HEAVY INDUSTRIES CO. LTD,**
**SAMSUNG LIFE INSURANCE SEOCHO,**
**TOWER, VOLVO CONSTRUCTION,**
**EQUIPMENT NORTH AMERICA, INC.,**

                                    **Defendants.**
_____

**APPEARANCES:**                            **OF COUNSEL:**

COZEN O'CONNOR                        Matthew F. Noone, Esq.
1900 Market Street
Philadelphia, Pennsylvania 19103
_Attorneys for Plaintiffs_

CANTER LAW FIRM P.C.                  Nelson E. Canter, Esq.
123 Main Street, 9th Floor
White Plains, New York 10601
_Attorneys for Plaintiffs_

BOND, SCHOENECK & KING, PLLC          Thomas D. Keleher, Esq.
One Lincoln Center
Syracuse, New York 13202-1355
_Attorneys for Defendants_

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

        Presently before the Court are plaintiffs' motions to exclude the opinions and testimony of

defendants' experts (Dkt. Nos. 33, 35 and 36) and defendants' motion to exclude the opinions and

testimony of plaintiffs' expert and for summary judgment and dismissal of plaintiffs' design

defect, failure to warn and negligence causes of action (Dkt. No. 34).

## PROCEDURAL HISTORY AND BACKGROUND[1]

On January 1, 2010, a fire occurred at a garage owned by the Town of Dannemora

Highway Department (the "Town"). In the garage, the Town kept three trucks manufactured by

International Trucks (Truck Nos. 1, 8 and 14), which were used for snow and ice removal and a

SL 12-2B ("Samsung Loader") which was used to load rock salt onto the plow trucks.[2]   At 4:30

a.m. on January 1, 2010, Howard "Pete" Barber ("Barber") (the Town Highway Superintendent)

arrived at the garage to prepare for snow removal. The remaining employees arrived around 5:00

a.m. and started the snow plow trucks and Samsung Loader to allow the vehicles to warm up

before leaving on their respective routes. Barber drove the Samsung Loader and loaded each

truck with salt. Barber then left the Samsung Loader on the loading ramp outside of the garage

---

[1] In support of the cross motion for summary judgment, defendants filed a Statement of Material Facts pursuant to Local Rule 7.1. Plaintiffs, although represented by counsel, failed to respond to defendants' Local Rule 7.1 Statement of Material Facts. Local Rule 7.1(a)(3) states:

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

Local Rule 7. 1(a)(3) (emphasis in original).

Generally, when a party fails to properly respond to a Statement of Material Facts, the Statement will be accepted as true to the extent that the facts are supported by evidence in the record. *See Orraca v. Pilatich*, 2008 WL 4443274, at *3 (N.D.N.Y. 2008); *see also N.Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 648–49 (2d Cir. 2005) (the Court deemed the properly supported allegations in the defendant's L.R. 7.1 Statement admitted for the purposes of the motion).   However, in this instance, the majority of the statements made in defendants' submission are not relevant facts.  Defendants also recite "facts" in the supporting  memorandum of law. While plaintiffs did not respond to the Statement of Material Facts, plaintiffs "take no exception to Section A and Section B" of defendants' facts. Therefore, to the extent that these statements are supported by the record, the Court will consider these "facts" for the purposes of this motion only. The facts, as discussed herein, are for the relevant time period as referenced in the complaint.

[2] Plaintiffs allege that, "[o]n or about July 1998, defendant Volvo Construction Equipment ("Volvo") purchased all of the assets of Samsung Heavy Industries, including but not limited to the [Samsung Loader]".

while the employees completed their snow removal routes.  Barber left the garage around 7:30 a.m., prior to the employees returning.

When the employees returned, Floyd "Rusty" Guerin drove the Samsung Loader from the loading ramp into the garage and Richard Dashnaw followed with Truck 14, both through the south end door.  Shortly after 8:00 a.m., Guerin called Barber to advise that the employees completed their routes, returned to the garage and were leaving for the day.  None of the employees recalled any problems with the operation of the Samsung Loader that day.  At approximately 9:10 a.m., the owner of a neighboring property saw black smoke emanating from the garage and notified the fire department and Barber.  Barber drove to the garage to find smoke and flames.

Richard Daus ("Daus"), a Fire Investigator with the Office of Fire Prevention and Control ("OFPC") (a statutory office within the New York State Division of Homeland Security and Emergency Services), conducted an investigation into the cause and origin of the fire as part of his duties.[3]  Daus arrived at the scene at approximately 4:52 p.m. and supervised other investigators from the New York State Office of Fire Prevention and Control and Clinton County over a two day period beginning on January 1, 2010 and ending on January 2, 2010.

On December 15, 2010, plaintiffs commenced the within action as subrogee of the Town of Dannemora seeking to recover the proceeds of the insurance policies that each company paid to the Town as a result of the fire.  Plaintiffs allege that the fire started when the Samsung Loader's "battery cable ground faulted, causing an arcing event and ignition of surrounding combustible materials".  Plaintiffs asserted three causes of action: (1) negligent design and manufacture; (2) failure to warn; and (3) strict liability. (Dkt. No. 1).

---

[3] Daus was not retained as an expert by either party.

## DISCUSSION

### I.      PLAINTIFFS MOTIONS TO EXCLUDE EXPERTS

Plaintiffs filed three motions seeking to exclude defendants' expert, Richard T. Daus, James F. Hahn, Jr. and Joseph Michael Miles.  Plaintiffs contend that the aforementioned expert testimony should not be admitted at trial because it would fail to comport with the standards set forth in Fed. R. Evid. 702 and *Daubert v. Merrill–Dow, Pharm. Inc.,* 509 U.S. 579 (1993). Defendants argue that, "a mere disagreement between experts, such as this, cannot form the basis for exclusion of testimony" and while, plaintiffs have identified items for cross-examination, "those items are matters that go to the weight, not the admissibility of the opinions".

### A.      Standard of Review

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.  That Rule provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In reviewing the admissibility of expert testimony, "the district court has a 'gatekeeping' function under Rule 702 – it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert*, 509 U.S. at 597).  The rule set forth in *Daubert* applies to scientific knowledge, as well as technical or other specialized knowledge.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

4

As the Second Circuit has explained,

> [i]n fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, *i.e.*, whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Next, the district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered. In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case. In short, the district court must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Amorgianos*, 303 F.3d at 265 (internal alterations, quotations, and citations omitted). The court must also consider the fact that "experience in conjunction with other knowledge, skill, training or education . . . [may] provide a sufficient foundation for expert testimony," and "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702; *see also Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience").

"In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos*, 303 F.3d at 266 (citation omitted). "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* "A minor flaw in an expert's reasoning or a slight modification

of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Id.* "'The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions.'" *Id.* (quotation and other citation omitted).

As the courts and Advisory Committee have made clear, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee's Note; *see also E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 456 (S.D.N.Y. 2004); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 313 F. Supp. 2d 213, 226 (S.D.N.Y. 2004). "This principle is based on the recognition that 'our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.'" *Melini v. 71ˢᵗ Lexington Corp.*, 2009 WL 413608, at *5 (S.D.N.Y. 2009) (quoting *Amorgianos*, 303 F.3d at 267).

However, "when an expert opinion is based on data, methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266; accord *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005).[4]  Furthermore, "it is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267.  Of course, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id.* at 266 (citing *Daubert*, 509 U.S. at 595).  Nevertheless, "conclusions and

---

[4] *See also Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358-60 (2d Cir. 2004) (holding that expert testimony that was speculative and unreliable was properly not considered by the district court on summary judgment); *Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 367 F. Supp. 2d 413, 416-17 (W.D.N.Y. 2005) (noting that "[a]n otherwise well-credentialed expert's opinion may be subject to disqualification if he fails to employ investigative techniques or cannot explain the technical basis for his opinion"); *Dora Homes, Inc. v. Epperson*, 344 F. Supp. 2d 875, 887-89 (E.D.N.Y. 2004) (declining to consider plaintiff's expert's testimony in deciding pending motions for summary judgment based on a finding that the expert's testimony "is unreliable under Fed. R. Evid. 702 and the principles articulated in *Daubert* and its progeny," given that the expert (1) qualified his opinions, (2) failed to support his opinions with any methodology which the court could analyze, and (3) rested his opinions "upon nothing more than subjective belief and unsupported speculation").

methodology are not entirely distinct from one another." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136,

146 (1997).  Accordingly, "[a] court may conclude that there is simply too great an analytical gap

between the data and the opinion proffered." *Joiner*, 522 U.S. at 146.

**B.     Richard T. Daus**

Plaintiffs argue that Daus' proposed testimony should be excluded because: (1) Daus

failed to describe his methodology; (2) Daus misapplied the principals outlined in the National

Fire Protection Association's ("NFPA") 921: Guide for Fire and Explosion Investigations; (3)

Daus failed to generate more than one hypothesis; and (4) Daus failed to gather sufficient data

regarding the cause of the fire.[5]

"NFPA 921 is a peer review and is generally accepted in the fire community." *Allstate*

*Ins. Co. v. Gonyo,* 2009 WL 1212481, at *6 (N.D.N.Y. 2009) (citation omitted).  In *Gonyo*, the

court discussed NFPA 921:

> NFPA 921's goal is to provide guidance to the investigators which is
> based upon accepted scientific principles. Chapter Four outlines a
> basic scientific methodology, a systematic approach to investigating
> fires. "With few exceptions, the proper methodology for a fire or
> explosion investigation is to first determine and establish the origin(s),
> then investigate the cause: circumstances, conditions, or agencies that
> brought the ignition source, fuel, and oxidant together." Such
> investigation requires an examination of the scene, interviewing
> witnesses, and testing the results. The empirical data collected, which
> is "based on observation or experience and is capable of being
> verified," is subject to an analysis premised upon inductive reasoning.

*Id.; see also Royal Ins. Co. of Am. v. Joseph Daniel Constr., Inc*., 208 F.Supp.2d 423, 426–27

(S.D.N.Y. 2002) (recognizing the NFPA 921 as a generally accepted standard in fire

investigations).  An analysis that includes a physical examination of the scene, interviews,

photographs of the scene, an examination of the evidence at the scene, wires and an on-site visit is

---

[5] Plaintiffs do not challenge Daus' qualifications.

consistent with the scientific methods underlying fire incident investigation as set forth in NFPA 921. *Kansas City Fire & Marine Ins. Co. v. Long Isl. Power Auth.*, 2007 WL 7034284, at *6 (E.D.N.Y. 2007).

Here, plaintiffs claim that Daus failed to sufficiently describe his methodology and misapplied the principals of NFPA 921.  However, the record does not support that assertion.  On the motion, plaintiffs cite to Daus' deposition testimony in an attempt to argue that he did not comply with portions of NFPA 921.  However, plaintiffs quoted only portions of the testimony and omitted relevant qualifying language.  The full testimony in regard to that issue was:

> Q.    Do you attempt to follow the provisions of 921 when you conduct your fire investigations?
>
> A.    Yes.
>
> Q.    Are there any provisions in 921, as you sit here today, that you have decided that you're not going to follow?
>
> A.    I wouldn't say that we've decided that we're not going to follow.  There are several provisions that we are in disagreement with, and for that reason don't follow to the letter.  I guess, yes.
>
> Q.    Okay. What are those provisions?
>
> A.    Specifically the ones that I'm familiar with are the sections that pertain to use of canine accelerant detection teams.
>
> *    *    *
>
> Q.    Other than those sections in the canine arson detection section of NFPA 921, are there any other sections anywhere within that document that as you sit here today you do not attempt to follow when you're conducting your cause and origin investigation?
>
> A.    I'm not aware of any.

Daus Dep. at p. 50.

There is no evidence or argument that any section pertaining to arson or canine detection was relevant to the cause of the fire herein.  Accordingly, the Court finds this portion of plaintiffs' argument unpersuasive.

Plaintiffs also claim that Daus failed to comply with NFPA 921 because he did not conduct arc mapping and that the witness interviews were insufficient to identify the origin of the fire.  According to Daus' affidavit and report, he conducted a visual inspection of the exterior and interior of the garage, evaluated fuel packages and fire patterns, examined fire debris and conducted a physical examination of the south end of the garage.  Daus Aff. at ¶ 10, 12, 15. Daus' investigation was conducted over the course of two days.  Daus also analyzed the contents damage, depth of char, melted objects, overhead damage and structural damage.  Daus then tested the hypothesis against all available evidence, both physical and testimonial.  *Id*. at 13-14. In his report, Daus indicated that he obtained "testimonial evidence" from Barber.  Daus Report at p. 2. Barber took photographs which he turned over to the investigators.  *Id*.

The Court has considered Daus' investigation, his background and experience and reviewed his report and affidavit and finds that his opinion is based upon reliable and accepted methodology and that his testimony will assist the jury.  Daus' reported investigation and the documentation thereof appears to have been conducted in accordance with the professional standards and scientific methodology used by fire investigation experts, which is set forth in NFPA 921.  *Selective Way Ins. Co. v. Nutone, Inc*., 2010 WL 3360127, 2 -3  (N.D.N.Y. 2010) (the expert's report complied with NFPA 921 because his investigation included an inspection of the scene of the fire on multiple occasions, an analysis of burn, smoke, and heat patterns, interviews of the lay witnesses, emergency responders, and official investigators, and an examination of the building's internal and external electrical service and all potential ignition

sources).  If Daus failed to "ardently and strictly followed each step of NFPA, these shortcomings will not be fatal to him testifying before the jury and having his opinion tested."  *Gonyo*, 2009 WL 1212481 at \*6; *see also Peerless Ins. Co. v. Marley Engineered Prod. LLC,* 2008 WL 7440158 at \*6 (E.D.N.Y. 2008) (citation omitted) ("[t]o the extent that defendant contends that further testing should have been conducted, those concerns go to the weight of the testimony, not to the admissibility").  The fact that Daus did not conduct arc mapping does not render his opinion any less reliable; nor does it automatically subject his opinion to preclusion.  *See Metlife Auto & Home v. Broan-Nutone, LLC,* 2011 WL 3736550, at \*2 -4  (N.D.N.Y. 2011).

With respect to plaintiffs' argument that Daus offers only a single hypothesis and failed to collect sufficient data, those arguments impact the weight of Daus' testimony not the admissibility.  "If there is any question that [the expert] did not eliminate every cause for the fire, this will not be determinative as to whether he will testify; all that it suggests is that the credibility of his decision may be subject to an attack".  *Id.*  "Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony."  *Cohalan v. Genie Indus., Inc.*, 2013 WL 829150, \*5 (S.D.N.Y. 2013) (quoting *Boucher v. U.S. Suzuki Motor Corp*., 73 F.3d 18, 21 (2d Cir.1996)).  Plaintiffs' claim that all other experts utilized a larger quantity of data in the investigation into the cause of the fire is not a basis to exclude Daus' testimony.  *See id.*

While many of plaintiffs' contentions are sensible, they simply go to the weight of Daus' testimony and do not provide a basis for exclusion. *See Demar v. D.L. Peterson Trust*, *No.*, 2006 WL 2987314, \*5 (N.D.N.Y. 2006) (permitting the testimony of the expert regarding the effect of

seatbelt use to challenge and discredit the defendant's expert and the methodologies he used in reaching his conclusions).  Daus' report and affidavit rest on a sufficiently reliable foundation and are relevant to the issues presented. *See Amorgianos*, 303 F.3d at 265 (citation omitted); *see also Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir.1995) (holding that the Supreme Court in *Daubert* "expressed its faith in the power of the adversary system to test 'shaky but admissible' evidence, ... and advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable" (quotation omitted)).  Based on the foregoing, plaintiffs' motion to exclude Daus' opinions and testimony is denied.  Daus will be permitted to testify at trial and offer his opinion as to the cause and origin of the fire, subject to cross examination.

**C.    James F. Hahn, Jr.**

Plaintiffs argue that Hahn's testimony should be excluded for the same reasons set forth above.  Plaintiffs also argue that Hahn is not a qualified "Origin and Cause" expert because he is a licensed professional engineer specializing in electrical engineering.

Under Rule 702, the court must make a determination of whether the expert is qualified "by knowledge, skill, experience, training, or education." Fed.R.Evid. 702. "A court should look at the totality of the witness' qualifications in making this assessment." *Peerless Ins. Co,* 2008 WL 7440158, at 2 -3 (citation omitted).  "This Circuit has adopted a liberal standard for qualifying an expert and there is no requirement that a witness have formal education or training before being qualified as an expert." *Id*. (citations omitted).  "The court must ensure, however, that the expert will be proffering opinions on issues that are within that expert's area of expertise." *Id*. (citing *Stagl v. Delta Air Lines, Inc*., 117 F.3d 76, 80 (2d Cir.1997)).

Defendants contend that Hahn was not retained to determine the origin and cause of the fire rather, he was retained to evaluate the electrical system of the Samsung Loader and to

consider whether the electrical arcing observed was the cause of ignition for the fire.[6]  Hahn is a professional engineer and specializes in electrical engineering.  Hahn Dep. at p. 20.  Hahn holds a Master's Degree in engineering and worked as an electrical engineer for various companies from 1960 through 1994. Since 1994, Hahn has worked as an engineering consultant and investigated failures in electrical and mechanical equipment that cause fires, personal injuries and property damage. Hahn Aff. at ¶ 4.  Hahn was retained by defendants to examine the electrical aspects of the Samsung Loader.  *See* Hahn Report at p. 2.

In *Peerless*, the Eastern District was presented with analogous arguments in opposition to testimony from a similarly qualified expert.  In that case, the defendant challenged the qualifications of an engineer.  The court held:

> These experts were not retained to determine the cause and origin of the fire. Rather, they were retained to evaluate the heater in question and determine if it malfunctioned. [The electrical engineer] [was] entitled to rely on [the cause and origin expert's ] findings with respect to cause and origin. Experts in fire cases often rely upon the observations of other experts in reaching their conclusions. "An expert does not have to conduct his own tests and may rely upon data that he did not personally collect."

*Peerless*, 2008 WL 7440158, at *6 (citations and internal citations omitted).

Plaintiffs have failed to cite to any case in support of exclusion that would persuade this court to depart from the holding in *Peerless*.

With regard to plaintiffs' remaining arguments relating to the methodology and substance of Hahn's proposed testimony, the Court finds those contentions unpersuasive and relies upon the caselaw set forth above.  Hahn averred that he examined all relevant data, including but not limited to the Samsung Loader wiring diagram, photographs, and deposition transcripts. Hahn

---

[6] Plaintiffs did not respond to defendants' argument.

Aff. at ¶ 6. Hahn also conducted physical examinations of the Samsung Loader and an exemplar of the Samsung Loader and considered the design of the electrical system . *Id*. at ¶ 8.  Based on all of the evidence available Hahn determined that an electrical failure in the Samsung Loader was not the source of ignition and that the electrical activity found on the positive battery cable resulted from being in the path of an impinging fire.  *Id*. at ¶ 7. The court is presently satisfied that Hahn's opinions are the product of reliable principles and methods, and the result of a reliable application of these principles to the facts. *See* Fed.R.Evid. 702; *see also Nimely v. City of New York*, 414 F.3d 381, 395–96 (2d Cir. 2005).   For these reasons and based upon the discussion *supra*, plaintiffs' motion to exclude Hahn's testimony is denied.

**D.**   **Joseph Michael Miles**

Plaintiffs move to exclude Miles' opinion arguing that it is based "upon junk science" and not sufficiently reliable.  Specifically, plaintiffs argue that: (1) Miles failed to conduct any physical testing; (2) Miles failed to cite any peer-reviewed articles to confirm his theory as scientifically valid; (3) plaintiffs' testing contradicts Miles' assertions; and (4) Hahn contradicts Miles' opinion.[7]

"The flexible *Daubert* inquiry gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact." *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC,* 2012 WL 2568972, at *16 (S.D.N.Y. 2012) (citing *Amorgianos*, 303 F.3d at 267). The law is well-settled that only serious flaws in an expert's reasoning or methodology will warrant exclusion. *Id*. (citing *Amorgianos*, 303 F.3d at 267).

---

[7] Plaintiffs do not challenge Miles' qualifications as an expert witness.

The Court has reviewed Miles' report, deposition testimony and affidavit and finds that plaintiffs' arguments are unrelated to admissibility.  Again, the issues raised in plaintiffs' motion impact the weight of Miles' testimony.   Miles inspected the subject vehicle and reviewed all pleadings discovery demands and responses, the operations and maintenance manual for the Samsung SL 120-2 wheeled loader, engineering drawings, the depositions of Howard E. Barber, Richard T. Daus, William Byrd, Floyd Guerin, Alvin Canning, Richard Dashnaw and John Bartz, the fire Richard Daus, Smith & Associates, Morrison Engineering, the Wright Group, Inc. and Jim Hahn. Miles' Decl at ¶7-8.  Miles also states that the "basis" for his report is NFPA 921 and that he conducted an investigation following a systematic process, recognized by National Fire Protection Association 921.  Miles Report at p. 2; Miles Decl. at ¶ 6.

Plaintiffs' motion to exclude Miles' testimony contains many factual averments and conclusory assertions for which there is either no support in the record or which are based upon plaintiffs' own expert's opinion.  The fact that Miles' opinion (or any expert opinion) is contradicted by other experts is not a basis to exclude his opinion.  Rather, that is an issue for the jury to consider.  The jury will receive clear instructions about how to weigh expert testimony. *See Okraynets v. Met. Transp. Authority*, 555 F.Supp.2d 420, 434 (S.D.N.Y. 2008).

Plaintiffs' argument that Miles' testimony should be excluded due to his failure to cite any engineering treatise or peer-review and his failure to perform physical testing is equally unpersuasive.  "While [the expert] may not have physically examined or tested [the vehicle] prior to writing his report, and while his opinion may not be grounded in a plethora of hard facts, data, studies, and scientific literature" is not a basis to exclude. *Figueroa v. Boston Scientific Corp.*, 254 F.Supp.2d 361, 368 -369 (S.D.N.Y. 2003).  There is no evidence that Miles' opinions "approach the outer boundaries of traditional scientific and technological knowledge" or based on

14

novel scientific evidence. *See id; Lappe v. Am. Honda Motor Co., Inc*., 857 F.Supp. 222, 228 (N.D.N.Y. 1994) (the expert's opinions are grounded in the results of his investigation, observations, experience, calculations, examination of accident reports, legal documents, medical records, medical images, owner's manuals, comparable Honda Civics, an inspection of the accident site, accident vehicle, transcripts of witness depositions, reports from defendants' liability experts, numerous photos of the accident scene, and police and medical reports).  The fact that Miles', or any expert offered herein, may have neglected to perform some "essential" tests or measurements will go to the weight of his testimony, not its admissibility.  *See Lappe*, 857 F.Supp. at 228.  Moreover, the absence of peer review and publication is not dispositive because this is only one prong of the *Daubert* reliability test. *See Kumho,* 526 U.S. at 151.

The Court has reviewed the caselaw cited by plaintiff in support of the within motion and notes that the cases are not from this Circuit and further finds the cases factually inapposite to the matter at hand.  As stated in *Daubert*, "[t]he proper course of action, [. . . ] is '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof[, which] are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Daubert*, 509 U.S. at 596.  Accordingly, plaintiffs' motion to exclude Miles' testimony is denied.

## II.   DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERT TESTIMONY AND FOR SUMMARY JUDGMENT

Defendants move to exclude plaintiff's expert, Ronald Parsons, arguing that while Parsons may be qualified to testify regarding the cause and origin of the fire, he does not possess the specialized knowledge or experience in electrical engineering to testify regarding design defects. Defendants also move for summary judgment and dismissal of plaintiff's claims of negligent manufacture, design defect and failure to warn.

**A.      Standard on Motion for Summary Judgment**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'"  *Id.* at 36-37 (quotation and other citation omitted).  Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56 ( c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986)) (other citations omitted).  Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions.  *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**B.      Products Liability**

"In New York, a plaintiff injured by an allegedly defective product may seek recovery against the manufacturer on the basis of any one or more of four theories of liability," including contract (express or implied), negligence, or strict products liability.  *Voss v. Black & Decker*

*Mfg. Co.*, 59 N.Y.2d 102, 106 (1983) (citing *Victorson v. Bock Laundry Mach. Co.*, 37 N.Y.2d 395, 373 N.Y.S.2d 39 (1975)).  Established New York law holds "that 'the manufacturer of a defective product is liable to any person injured or damaged if the defect was a substantial factor in bringing about his injury or damages; provided (1) that at the time of the occurrence the product is being used . . . for the purpose and in the manner normally intended, (2) that if the person injured or damaged is himself the user of the product he would not by the exercise of reasonable care have both discovered the defect and perceived its danger, and (3) that by the exercise of reasonable care the person injured or damaged would not otherwise have averted his injury or damages.'"  *Voss*, 59 N.Y.2d at 106 (quoting *Codling v. Paglia*, 32 N.Y.2d 330, 342 (1973)).  A manufacturer may be liable under strict products liability for defective products based on a "manufacturing flaw, improper design or failure to warn."  *Sukljian v. Charles Ross & Son Co., Inc.*, 69 N.Y.2d 89, 94 (1986) (citations omitted).  Specifically, under strict products liability, a manufacturer which places a defective product on the market is liable for injury resulting from using the product for its intended or reasonably foreseeable purposes.  *See Denny v. Ford Motor Corp*, 87 N.Y.2d 248, 258-59 (1995).  In the present matter, plaintiffs allege strict products liability claims of defective design and failure to warn.

### 1.   Design defect

To establish a *prima facie* case in strict products liability based on design defect, "'the plaintiff must show that the manufacturer breached its duty to market safe products when it marketed a product designed so that it was not reasonably safe and that the defective design was a substantial factor in causing plaintiff's injury.'"  *Adams v. Genie Indus., Inc.*, 14 N.Y.3d 535, 542

(2010) (quotation omitted).[8]  Whether a product "is not reasonably safe" has been described as follows: "'whether . . . if the design defect were known at the time of the manufacture, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner.'"  *Id.* (quotation omitted).  Therefore, to succeed on this claim, plaintiffs must establish that (1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing her injury.  *See Voss*, 59 N.Y.2d at 108 (citation omitted).    A design defect claim requires expert testimony as to the feasibility and efficacy of alternative designs.  *Soliman v. Daimler AG*, 2011 WL 6945707, at *5 (E.D.N.Y. 2011).  However, defendants argue that without expert testimony to support their claim, plaintiffs have failed to establish that a design defect proximately caused the incident at issue.

### a.  Rule 702 and Qualifications

Courts must consider "the totality of a witness's background when evaluating the witness's qualifications to testify as an expert ."  *Keenan v. Mine Safety Appliances Co.,* 2006 WL 2546551, at *2 -3 (E.D.N.Y. 2006) (citations omitted).  Witnesses can qualify as experts under Rule 702 on the basis of practical experience alone, and a formal degree, title, or educational speciality is not required. *Bloom v. ProMaxima Mfg. Co.,* 669 F.Supp.2d 321, 328 (W.D.N.Y. 2009) (light of the expert's claims of experience with athletic equipment and his examination of the chair at issue, the Court concluded it would be error to exclude his testimony simply because he may not be the best qualified or possess the most appropriate specialization) (citing *Am. Tech. Res. v. U.S.*, 893

---

[8] "In design defect cases, the alleged product flaw arises from an intentional decision by the manufacturer to configure the product in a particular way.  In contrast, in strict products liability cases involving manufacturing defects, the harm arises from the product's failure to perform in the intended manner due to some flaw in the fabrication process.  In the latter class of cases, the flaw alone is a sufficient basis to hold the manufacturer liable without regard to fault."  *Denny*, 87 N.Y.2d at 257 n.3 (citation omitted).

F.2d 651, 656 (3d Cir.1990)).  The court must ensure, however, that the expert will be proffering opinions on issues that are within that expert's area of expertise. *Peerless*, 2008 WL 7440158, at *6 (citing *Stagl*, 117 F.3d at 80). The Second Circuit has held that disputes about an expert's credentials go to the weight, not the admissibility, of his testimony.  *Id*. (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir.1995)).  In assessing expert qualifications, "[l]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications." *Lappe,* 857 F.Supp. at 227 *aff'd* 101 F.3d 682 (2d Cir. 1996) (expert qualified to testify on automobile design even though he did not design automobiles for a living). A person knowledgeable about a particular subject need not be precisely informed about all the details of the issue raised in order to offer an opinion. *King v. Brandtjen & Kluge, Inc*., 2001 WL 1804345, at *2-7  (W.D.N.Y. 2001) (citing *Thomas J. Kline, Inc. v. Lorillard, Inc*., 878 F.2d 791, 799 (4th Cir.1989)).

In *Kass v. W. Bend Co.*, 2004 WL 2475606, at *4-5  (E.D.N.Y. 2004), the defendant moved to exclude the plaintiff's expert from testifying that a design defect in the defendant's coffee maker cause the plaintiff's injuries.  The defendant relied upon the fact that the expert never designed a consumer product, did not contribute to literature in connection with the design of consumer goods, did not participate in any standard-making activities as they relate to the design of consumer products, and was not familiar with the standards applicable to coffee makers or similar consumer products.. *Id*. at *5.  The Eastern District held that the expert possessed, "extensive experience in accident prevention and product safeguards, [and] skill or knowledge greater than the average layman concerning product safety, regardless of whether the product is a commercial or consumer product". *Id*.  The Court concluded that the, "[l]ack of familiarity with

UL coffee maker standards, and experience with coffee maker design goes to the weight of Harkness' testimony, rather than the question of admissibility". *Id.*

In *Kansas City Fire & Marine Ins. Co. v. Long Island Power Auth.*, 2007 WL 7034284, at *7 (E.D.N.Y. 2007), the defendant moved to preclude the plaintiff's expert from testifying on electrical issues because the expert did not have a formal degree in electrical engineering. The court discussed the expert's qualifications and noted that he had a B.S. in mechanical engineering, classroom training in electrical engineering and was employed for 16 years with ConEdison. The expert also was certified by the National Academy of Forensic Engineers, investigated damages and testified in cases. *Id.* While the expert had no formal training in cause and origin of fires, he averred that he had experience participating in investigations with cause and origin personnel. *Id.* The court denied the motion and held, "[a]s long as the expert has experience to support his opinion, explains how such experience leads to the expert's conclusion and demonstrates how the experience is reliably applied to the facts at hand, he should not be required to satisfy an overly narrow and rigid test in order to be considered an expert." *Id.* "An expert with the minimum level of education and relevant experience in the field should not be precluded from testifying." *Kansas City Fire & Marine Ins. Co.*, 2007 WL 7034284, at *7.

In this matter, defendants' sole argument in opposition to Parsons' testimony is that Parsons "lacks the requisite education and experience to offer [ ] opinions and [ ] testimony regarding design defects and alternatives". Specifically, defendants contend that while Parsons completed high school, he only attended two years of college and lacks the educational experience necessary to testify. Moreover, defendants allege that Parsons' practical experience is limited to cause and origin investigation. Defendants cite to Parson's deposition testimony wherein he stated that "100% of his business is attributed to origin and cause investigation".

The Court has reviewed Parsons' report, his deposition testimony and his affidavit. Parsons avers that he has attended more than 100 hours of seminars and conferences relating to electrical engineering and/or product design. Parsons is a member of the Society of Automotive Engineers ("SAE") which sets standards in the design analysis and safety engineering in the automotive industry including motorized heavy equipment. Parsons claims that he routinely reviewed and implemented the standards in work performed related to heavy motorized equipment. Parsons Aff. at ¶6. Parsons is a member of the National Institute of Automotive Excellence holding more than forty separate certifications. Parsons has worked as a consultant for an automotive manufacturer to evaluate the design of its products and assess the electrical wiring. For over forty years, Parsons has conducted hundreds of inspections of heavy motorized equipment to evaluate and consider the impact of unsecured and unprotected positive battery cables on the design of such products. Parsons Aff. at ¶ 12. Parsons states that he was previously accepted as an expert witness at trial in Florida involving equipment similar to the Samsung Loader at issue herein. In that case, Parsons offered opinions regarding the origin of a fire and also opinions on the failure in the design of the product. In addition, he previously testified as an expert offering opinions on the design of vehicles in state court in Connecticut and Mississippi.

In his report, Parsons offers conclusions regarding the cause and origin of the fire. Parsons opined that the fire was accidental and that it originated at the left side engine compartment of the Samsung SL1 20 wheel loader. He concluded, "[t]he improper routing, securing, protection, and circuit design of the positive cables have allowed the positive cable insulation to deteriorate. As a result of the cable insulation deteriorating, a ground fault (arc) occurred." Parsons opined that the fire was caused "because the design of the starting circuit

allows for the positive cables to be unprotected, and energized while the Samsung SL 120 wheel

loader is at rest." Parsons provided alternative designs. Parsons concludes and reiterates in

several sections of the report that a design change, i.e., "de-energizing the positive battery cable

from the battery to the starter would have eliminated this fire as it occurred". Parsons noted that

"[t]he technology was available at the time of the manufacture of the Samsung".

> Parsons reiterated:

> > The party responsible for this fire is Samsung. Had the manufacturer, Samsung, made simple design changes, the risk of fire, starting while the Samsung SL 120 wheel loader was unattended, would have been eliminated.

> > Rerouting of the positive battery cable, using additional clamps with protective covering on the cables, as well as utilizing a battery relay in the battery box, would have eliminated this fire.

> > Samsung uses a battery relay, which isolates the alternator from the wiring architecture of the Samsung SL 120 wheel loader. Other manufacturers also use battery relays in their construction equipment. Other manufacturers place the battery relay in the battery compartment box and when the key is in the off position, the alternator cable, as well as the positive battery cable going to the starter is also de-energized. Samsung through a slight design change could have eliminated this fire hazard.

> > Samsung should have used other alternative designs that were readily available, which would have eliminated the positive battery cable from being energized on the Samsung SL 120 wheel loader when it was at rest.

> > The physical evidence of electrical activity on the positive conductors indicates that there was energy available in the conductors. The use of a solenoid (battery relay) to deenergize the circuits when the machine is off would eliminate the potential for a ground fault to occur when this machine was not operated. A positively charged cable was allowed to chafe in the Samsung SL 120 wheel loader over time. The insulation degraded, causing a ground fault event. As a result of localized heating by this event, ordinary combustibles directly in the vicinity were ignited. Growth fuels allow the fire to spread within the engine compartment and eventually spread out of the loader. An analysis of the fire event indicates the only ignition source is the

electrical wiring architecture of the subject Samsung SL120 wheel loader.

\*       \*       \*

Other manufacturers (such as Van Hool, Hyundai Construction Industries, Ford, Komatsu, and Link-Belt, just to name a few) use a battery relay to de-energize the positive battery cables. If a design alternative had been utilized in the Samsung SL 120 wheel loader then the fire would not have occurred in the manner that it did.

Corrective procedures were available to Samsung:

1. Samsung should have used other alternative designs that were readily available, which would have eliminated this positive cable being energized while the subject vehicle was parked. This simple design change would have eliminated this fire as it occurred. This alternative design was available at the time the Samsung SL 120 wheel loader was manufactured, and other manufacturers have used this alternative design since the 1960's.

2. The routing of the positive cable should have been routed such that maximum protection was provided by the vehicle sheet metal and structural components.  The routing of the cable should have avoided abrasion at all locations. Rerouting and protecting the positive cable should have avoided areas of abrasion and vibration. Extra protection, such as additional P-clamps, would have provided additional protection to the positive cable. Samsung knew, or should have known, that a cable traveling in the engine compartment would be subjected to oils and dirt. Samsung also knew, or should have known, that there was excessive vibration that is inherent to this piece of equipment. Samsung should have installed the positive cable in a conduit and provided additional clamping of the positive cable to secure the cable and also to protect the cable from abrasion and vibration. Samsung did not follow these simple procedures, therefore allowing the cable to chafe and deteriorate and an eventual ground fault occurred. As a result of this ground fault a fire ensued. If the positive cable was routed and protected correctly, the battery cable should last the life of the vehicle.  The protection of the battery cable, additional clamps, and readily known design modifications would have eliminated this event. These actions have caused substantial property damage to the subject Samsung SL 120 wheel loader and the property and equipment owned by the Town of Dannemora.

With respect to his education, while Parsons is not an academically trained engineer and has not published articles in peer-reviewed journals, "these classic Daubert factors are not the *sine qua non* of admissibility under Rule 702." *King*, 2001 WL 1804345 at *2-7. In *King,* the defendant asserted similar arguments. The defendant moved to exclude the plaintiff's expert arguing that he never received his high school diploma, was not a professional engineer and had no formal training in engineering. In addition, the defendant stated that the expert never actually made or designed a platen press and therefore cannot claim to be an expert in the safe design of platen presses. The defendant also relied upon the fact that the expert published no opinions regarding printing press design, was never been involved in a patent application regarding printing press technology, and held no professional certifications. *Id.* Finally, the defendant contended that the expert had only "minimal" hands-on experience with the defendant's presses. The Court was not persuaded and held that while the expert admittedly lacked formal education, his considerable experience in the printing industry and his corresponding experience with platen presses— both made by the defendant and others—was sufficient to qualify him as an expert on the custom and practice of printing press manufacturers in and around 1950. *Id.*

Regarding his alternative design, Parsons states that he has "installed and extensively tested his alternative design" and further avers that it is "presently utilized by multiple heavy motorized equipment manufacturers". Parsons Aff. at ¶10-11. "Whether an alternative design is safer presents a question of fact, not law, for the jury to decide." *See Quiles v. Bradford–White Corp.*, 2012 WL 1355262, *4 (N.D.N.Y. 2012) (citation omitted). Based upon his professional experience and the fact that Parsons has stated that he can support plaintiffs' design defect claim with a possible and feasible alternative design, the Court holds that plaintiffs may present Parsons

opinions on design to the jury.  *See Congilaro v. Crown Equip. Corp.*, 2012 WL 3821952, 3 -4 (N.D.N.Y. 2012).

Defendants cite to *Quiles* as support for their argument that Parsons is not qualified to testify regarding design defects. In that case, the Court precluded the plaintiff's experts from testifying but did not engage in an analysis of their qualifications.  Rather, the Court granted summary judgment in favor of the defendants on the design defect claim because the plaintiff's experts did not set forth any analysis about an alternative water heater design nor did they discuss the feasibility of an alternative design in their expert reports.  *Quiles,* 2012 WL 1355262 at *5.

Defendants also rely upon *Trumps v. Toastmaster, Inc.*, 969 F.Supp. 247, 252 (S.D.N.Y. 1997).  In that case, the defendant challenged the plaintiff's expert's qualifications.  The expert testified that as a mechanical engineer, he devoted a substantial amount of his time to slip and fall cases; that his work experience embraces only a limited involvement with electrical engineering; that he belonged to no electrical engineering professional societies, published no articles, in that field, held no electrical patents, and was unable to identify any authoritative texts or articles about electrical engineering.  *Id.*  The Court noted that the expert proffered no alternative design of his own, was not qualified to express an opinion that within the relevant context of electrical engineering, Toastmaster's design of this model griddle was defective.  *Id.*

Finally, defendants' rely on *Bogosian v. Mercedes-Benz of N. Am., Inc.*, 104 F.3d 472 (1st Cir. 1997).  In *Bogosian*, the proposed testimony by plaintiff's expert included an opinion regarding a design defect in the false park mechanism of a Mercedes vehicle.  The expert did not have an engineering degree and lacked formal education.  The expert relied upon his "hands on experience" with automatic transmissions but conceded that he never professionally designed a

25

component for an automobile.  *Id.* at 477.   The Court held that while the expert had "extensive experience with automotive repair", his background lacked any significant expertise by way of knowledge, skill, experience, training or education in the relevant area.  *Id.*   The Court reasoned:

> While not dispositive, the lack of a mechanical engineering degree or other engineering expertise certainly calls into question Davidson's ability to criticize the design of a transmission parking mechanism and its operation under various circumstances. On this background, we find no clear error in the district court's finding that Davidson was not qualified to opine on the issue of a transmission design defect.

*Id.*

The aforementioned cases are factually distinguishable from the issues at hand.  Here, Parsons has proffered sufficient evidence to establish that his background and experience render him qualified to offer an opinion that will assist the jury herein.   During his depositions, Parsons stated that he had been involved with other cases against heavy equipment manufactures that involved fires that he concluded occurred as a result of a ground fault on a positive battery cable. Parsons Dep. at p. 29, 36.   Moreover, Parsons offers an alternative design which he claims he designed, implemented, installed and tested his alternative design and that his design is currently utilized by multiple heavy motorized equipment manufacturers.  Parsons Aff. at ¶ 9, 10, 11.

Consequently, the Court finds that Parsons' is sufficiently qualified to offer expert testimony in this matter that will assist the jury.  Defendants' motion to exclude is denied.

### b.      Merits of Design Defect Claim

Defendants' motion for summary judgment and dismissal of plaintiffs' design defect claim is based solely upon the exclusion of Parsons' testimony.  Based on the foregoing, the Court denies defendants' motion for summary judgment as to plaintiff's design defect claim.

### 2.      Failure to warn

Plaintiffs seek leave from the Court to amend the complaint to eliminate "failure to warn" or "manufacturing defect" causes of action. (Dkt. No. 37, p. 4).   As such, plaintiffs request that this Court deem that portion of defendants' motion as moot.  Defendants disagree and argue that the Court should enter an Order granting defendants' motion in this regard.   As plaintiffs have withdrawn any claim for failure to warn, defendants' motion is granted and all failure to warn and manufacturing defect claims are dismissed.  *See Quiles*, 2012 WL 1355262, at *4 (the court awarded defendants' summary judgment after the plaintiffs withdrew claims for a manufacturing defect).

### C.     Negligence

Although plaintiffs assert the design defect claim under theories of strict products liability and negligence, the same *prima facie* case is required under both theories.  *See Jarvis v. Ford Motor Co.*, 283 F.3d 33, 62-63 (2d Cir. 2002) (citing *Denny*, 87 N.Y.2d at 248) ("In general, . . . the strict liability concept of 'defective design' is functionally synonymous with the earlier negligence concept of unreasonable designing" (internal citation omitted)).  In particular, the decisive question for both strict liability and negligent design causes of action is whether the evidence establishes that the product "was 'not reasonably safe' as *Voss* defines the term." *Adams*, 14 N.Y.3d at 543.  Moreover, it is well-settled law that "'[w]here liability is predicated on a failure to warn, New York views negligence and strict liability claims as equivalent.'" *Estrada v. Berkel Inc.*, 14 A.D.3d 529, 530 (2d Dep't 2005) (quotation omitted).

Since the Court has denied defendants' motion for summary judgment as to plaintiffs' strict liability claims, defendants' arguments as to plaintiffs' negligence claims must also fail.  As such, the Court denies defendants' motion seeking dismissal of plaintiffs' negligence claims.

### CONCLUSION

**IT IS HEREBY**

**ORDERED** that plaintiffs' motions to preclude defendants' experts from testifying at trial (Dkt. Nos. 33, 35 and 36) are **DENIED**; it is further

**ORDERED** that defendants' motion to preclude defendants' expert from testifying (Dkt. No. 34) is **DENIED**; it is further

**ORDERED** that defendants' for summary judgment (Dkt. No. 34) is **GRANTED IN PART and DENIED IN PART**.  Defendants' motion is granted to the extent that all of plaintiffs' failure to warn and manufacturing defect claims are dismissed.  The motion is denied in all other respects.

**IT IS SO ORDERED.**

Dated:  March 11, 2013
        Albany, New York

Mae A. D'Agostino
U.S. District Judge